JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
NANCI E. NISHIMURA (SBN 152621)
nnishimura@cpmlegal.com
JAMES DALLAL (SBN 277826)
jdallal@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone:   (650) 697-6000
Facsimile:    (650) 697-0577

KELLY W. WEIL (SBN 291398)                  P. TERRY ANDERLINI (SBN 44783)
kweil@cpmlegal.com                          tanderlini@amlawoffice.com
**COTCHETT, PITRE & McCARTHY, LLP**          **ANDERLINI & McSWEENEY LLP**
2716 Ocean Park Boulevard, Suite 3088       66 Bovet Road, Suite 285
Santa Monica, CA 90405                      San Mateo, California 94402
Telephone: (310) 392-2008                   Telephone:   (650) 242-4884
Facsimile: (310) 392-0111                   Facsimile:    (650) 212-0001

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PETER NAHM,** individually; and **GRACE NAHM,** individually, | CASE NO: |
| Plaintiff, | **COMPLAINT for:** |
| v. | 1. **NEGLIGENCE – PERSONAL INJURIES** |
| **CARNIVAL CORPORATION,** a Panama corporation; **CARNIVAL PLC,** an England and Wales corporation**;** and **PRINCESS CRUISE LINES, LTD.,** a Bermuda Corporation**,** | 2. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

PAGE NO.

I.     INTRODUCTION ................................................................. 1

II.    THE PARTIES ................................................................... 6

   A.  PLAINTIFFS ................................................................ 6

   B.  DEFENDANTS .............................................................. 7

   C.  ALTER EGO, AGENCY & JOINT VENTURE ......................... 9

III.   JURISDICTION & VENUE ................................................. 15

IV.    FACTUAL ALLEGATIONS ................................................. 16

   A.  THE CRUISE SHIP INDUSTRY REAPS MASSIVE PROFITS BY
      SELLING LUXURY TRAVEL TO AMERICANS ......................... 16

   B.  DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS
      AND DEADLY BEFORE INVITING PLAINTIFFS TO BOARD
      THE *CORAL PRINCESS* ............................................... 18

   C.  DESPITE KNOWING THEIR CRUISE SHIPS WERE ARMED WITH
      A CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS INVITED
      PLAINTIFFS TO BOARD THE SHIP AND FAILED TO TAKE ANY
      SAFETY PRECAUTIONS OR WARN PASSENGERS ...................... 29

   D.  DEFENDANTS MAKE THE LION'S SHARE OF THEIR PROFITS
      FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES .... 30

   E.  DEFENDANTS DID NOT WARN OR ADVISE PASSENGERS OF
      THE VIRUS BEING ON-BOARD THE *CORAL PRINCESS* UNTIL
      THREE WEEKS AFTER BOARDING ..................................... 32

   F.  PLAINTIFFS' DREAM VACATION TURNED INTO A NIGHTMARE
      AFTER DEFENDANTS UNLOAD PASSENGERS TO SUFFER AND
      DIE ON LAND ......................................................... 38

   G.  CARNIVAL IS NOW UNDER CONGRESSIONAL INVESTIGATION
      FOR THEIR KNOWLEDGE OF INFECTIONS ........................... 47

V.     NOTICE ........................................................................ 48

VI.    CLAIMS ........................................................................ 49

FIRST CLAIM
NEGLIGENCE
(ON BEHALF OF MRS. NAHM AND MR. NAHM
AGAINST EACH DEFENDANT) ................................................ 49

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

SECOND CLAIM
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(ON BEHALF OF MRS. NAHM AND MR. NAHM
AGAINST EACH DEFENDANT).................................................................................. 55

**VII.   PRAYER FOR RELIEF AND DEMAND FOR JURY ................................................ 59**

1    PLAINTIFFS **PETER NAHM** and **GRACE NAHM** (collectively "NAHM"),

2   bring this action for personal injuries against DEFENDANTS **PRINCESS CRUISE**

3   **LINES, LTD.** ("PRINCESS"), **CARNIVAL CORPORATION** ("CARNIVAL

4   CORP."), and **CARNIVAL PLC** ("CARNIVAL PLC"; together with CARNIVAL

5   CORP., "CARNIVAL"; and collectively with PRINCESS and CARNIVAL CORP.

6   hereinafter ("DEFENDANTS").

7   **I.    INTRODUCTION**

8        1.    When MR. and MRS. NAHM boarded the *Coral Princess* cruise ship in

9   San Antonio, Chile on March 5, 2020, neither of them had any knowledge, notice,

10   and/or warning that they were boarding a cruise ship armed with a super virus known

11   to be highly contagious, kill at-risk populations quickly, and have no cure—SARS-

12   CoV-2, the novel coronavirus that causes COVID-19.

13        2.    While PRINCESS and CARNIVAL maintain their United States'

14   headquarters in California and Florida, respectively, the officers, directors, and/or

15   managing agents of DEFENDANTS, and/or each of them, ignored the "state of

16   emergency" declarations related to COVID-19 made by the Governors of both states

17   as of March 4, 2020, and instead made the negligent, wrongful, unlawful, and/or

18   reckless decision to continue cruise ship operations without implementing any safety

19   protocols and/or preventative measures, despite knowledge of the catastrophic risk to

20   human life that COVID-19 posed and despite knowledge of the specific and acute

21   threat the cruise ship industry presented related to COVID-19.

22        3.    Due to that negligent, wrongful, unlawful, and/or reckless decision of the

23   officers, directors, and/or managing agents of DEFENDANTS, and/or each of them,

24   MR. and MRS. NAHM boarded the *Coral Princess* cruise ship in San Antonio, Chile

25   on March 5, 2020.

26        4.    The officers, directors, and/or managing agents of DEFENDANTS,

27   and/or each of them, knew of the specific and acute threat the cruise ship industry

28   presented related to COVID-19 as of March 4, 2020.

5.     There had been two prior and/or on-going outbreaks aboard DEFENDANTS' other cruise ships: The *Diamond Princess* and the *Grand Princess*.

6.     The *Diamond Princess,* had been under quarantine at Yokohama's port near Tokyo since February 3, and as of February 20, 2020, world news was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "**[a] total of 634 people from the *Diamond Princess* have tested positive for COVID-19**, the Japanese agency said. **More than half that number are identified as "asymptomatic pathogen carriers," meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[1] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the *Diamond Princess* and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period *for their traveling partners and close contacts***."[2]

7.     The *Grand Princess* boarded new passengers on February 21, 2020, and set off from San Francisco for Hawaii. A passenger who disembarked the *Grand Princess* on February 21, 2020, but who had traveled with approximately 62 passengers and 1,000 crew members for over a week before, had COVID-19 and had been experiencing severe respiratory symptoms for his last seven days of the cruise.[3] Despite being aware of the passengers symptoms, DEFENDANTS, and/or each of them, boarded new passengers onto the *Grand Princess*, and on March 4, 2020, Dr. Grant Tarling—who is the Chief Medical Officer and hailed by both DEFENDANTS as a world-renowned medical expert in the virulent nature of infectious diseases—

---

[1] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed June 5, 2020).
[2] Id.
[3] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020. (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

issued a statement to all passengers indicating knowledge of a coronavirus outbreak aboard.

8.    Approximately two weeks before the *Coral Princess's* scheduled departure on March 5, 2020, DEFENDANTS notified passengers with South Korean passports that they would not be allowed on the cruise, due to coronavirus-related travel restrictions imposed by the South Korean government.

9.    As of March 2, 2020, Vice President Michael Pence had also called a meeting with the heads of the cruise ship industry to discuss the specific and acute threat the cruise ship industry presented related to COVID-19. [4] After that meeting, Vice President Pence reported:

> "**We made it very clear that we needed cruise lines to be safer; to establish and to embrace new protocols; screening onboard, screening off; new medical protocols; shipboard processes for evacuating people that may contract coronavirus or a serious illness**," **Pence said at a news briefing on Monday**. [5]

10.    Yet CARNIVAL acting through its alter ego PRINCESS, and/or each of them, negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of their passengers, invited and boarded MR. and MRS. NAHM onto the deadly cruise ship armed with COVID-19 without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew. CARNIVAL acting through its alter ego PRINCESS, and/or each of them, also negligently, wrongfully, unlawfully, and/or with a willful and/or conscious disregard for the safety of its passengers, failed to disinfect, decontaminate, and/or sanitize the exposed surfaces of the cruise ship

---

[4] https://www.reuters.com/article/us-health-coronavirus-airlines-whitehous/white-house-set-to-meet-with-senior-airline-cruise-industry-officials-idUSKBN20P2FC (last accessed June 5, 2020).

[5] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

prior to boarding MR. and MRS. NAHM and failed to administer any coronavirus tests to any prior passengers and/or crew, leaving all new passengers, including MR. and MRS. NAHM, completely, unknowingly, and inescapably exposed to the deadly virus.

11.     The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, also knew of the catastrophic risk COVID-19 posed to human life as of March 4, 2020.  As of that date, COVID-19 had killed over 3,000 people and there were over 98,000 cases reported worldwide."[6] The CDC had also reported in February 2020, "**[i]t found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS**. **While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses**."[7] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[8]

12.     Despite the aforementioned knowledge, the officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures to combat the foreseeable, specific, and/or acute and catastrophic threat posed to their passengers, including but not limited to, (a) screening and refusing to board passengers and crewmembers with recent contact with countries experiencing outbreak of COVID-19; (b) providing precautionary medical apparatuses, such as masks, gloves and/or hand sanitizer; (c) imposing safety precautions on-board, such

---

[6] https://www.worldometers.info/coronavirus/worldwide-graphs (last accessed June 5, 2020).
[7] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html (last accessed June 5, 2020).
[8] Id.

**COMPLAINT**                                                                                                    4

as social distancing; (d) disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship prior to boarding passengers; and/or (e) changing how they off-board and on-board passengers to the ship, instead of using practices where passengers off-boarding the ship come in close contact with passengers on-boarding the ship. As a legal result of the aforementioned wrongdoing, PLAINTIFFS both got COVID-19 on the *Coral Princess*, after first being told they had the flu.

13.     According to industry experts, commercial cruise ship companies make money in two ways: tickets sales and on-board purchases. While tickets represent a majority of revenue for this companies, ***onboard purchases account for the lion's share of the profit***.[9] This dynamic creates an obvious financial incentive for the officers, directors, and/or managing agents of DEFENDANTS to knowingly board passengers on a cruise ship armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket.

14.     Further, Dr. Tarling, whose office is located in Santa Clarita, California, knows (and at all relevant times knew) about the virulent nature of infectious diseases. CARNIVAL touts his 27 years of experience overseeing the health and welfare of 12 million passengers annually and thousands of crew members aboard CARNIVAL'S 104 cruise ships across its nine cruise lines.  Dr. TARLING is an internationally recognized medical expert in the cruise industry for developing and implementing policies and procedures to protect global travelers:

> Dr. Tarling is also charged with developing and implementing research-based public health policies and procedures that protect large populations of global travelers.  His expertise is routinely called upon by national and international health authorities to help develop prevention and control measures to mitigate the global spread of

---

[9] *Id.*

*communicable diseases such as Zika, Ebola, MERS, Chikungunya, Legionella, noroviruses and novel influenza viruses.*[10]



[11]

## II.   THE PARTIES

### A.   PLAINTIFFS

15.   PLAINTIFF **Peter Nahm** ("MR. NAHM") is and was at all times relevant to this Complaint, a resident of Syosset, New York within Nassau County. MR. NAHM was a ticketed passenger who boarded the *Coral Princess* cruise on March 5, 2020 in San Antonio, Chile after using a ticket for air travel purchased from DEFENDANTS to fly to South America from New York.

16.   PLAINTIFF **Grace Nahm** ("MRS. NAHM"), is and was at all times relevant to this Complaint, a resident of Syosset, New York within Nassau County. MRS. NAHM was a ticketed passenger who boarded the *Coral Princess* cruise on March 5, 2020 in San Antonio, Chile after using a ticket for air travel purchased from DEFENDANTS to fly to South America from New York.

---

[10] https://www.princess.com/news/notices_and_advisories/notices/dr-grant-tarling-chief-medical-officer.html (last accessed June 5, 2020).

[11] https://www.theguardian.com/world/2020/apr/04/coral-princess-cruise-ship-docks-florida-coronavirus-pandemic (last accessed June 5, 2020).

**B.  DEFENDANTS**

17.  DEFENDANT **Carnival Corporation** ("CARNIVAL CORP.") was incorporated in Panama in 1972. DEFENDANT **Carnival plc** ("CARNIVAL PLC") was incorporated in Wales, United Kingdom in 2000. As described by CARNIVAL in a filing with the Securities and Exchange Commission, "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plcs's Articles of Association." Carnival Corporation and Carnival plc operate as a single economic enterprise, and share a senior executive management team and identical Boards of Directors. The dual-listed company has its headquarters in Miami, Florida. This lawsuit is being brought against both CARNIVAL CORP. and CARNIVAL PLC for actions and decisions attributable to both taken by and on behalf of the dual-listed company"". Allegations herein against DEFENDANT "CARNIVAL" refer to the dual-listed company encompassing both CARNIVAL CORP. and CARNIVAL PLC.

18.  DEFENDANT **Princess Cruise Lines LTD** ("PRINCESS") is incorporated in Bermuda, with its headquarters in Santa Clarita, California. Santa Clarita serves as the nerve center for PRINCESS, and all major decisions regarding operation of its cruise ships are made at the headquarters in Santa Clarita, California.

19.  CARNIVAL and PRINCESS are collectively referred to herein as "DEFENDANTS."

/ / /

/ / /

12

20.     Agent for DEFENDANTS, Dr. Grant Tarling, M.D., M.P.H. ("TARLING"), is and was at all times hereto employed by DEFENDANT CARNIVAL as the Group Senior Vice President and Chief Medical Officer for the CARNIVAL'S cruise lines including PRINCESS, Carnival Cruise Lines, Holland America Line, Seabourn, P&O Australia and HAP Alaska, totaling 104 ships.  He earned his medical degree from the University of Witwatersrand Medical School in Johannesburg, South Africa, and executive master's degree in healthcare administration and policy from UCLA. His offices are located at the headquarters for CARNIVAL and PRINCESS in Santa Clarita, California.  Dr. Grant TARLING is a resident of the County of Los Angeles.

21.     At all times hereto, PRINCESS and CARNIVAL advertised, marketed, sold, and profited (directly or indirectly) from, and controlled and operated the cruise ship *Coral Princess*.

---

[12] Princess Cruises headquarters in Santa Clarita, California. (last accessed June 5, 2020).

### C.   ALTER EGO, AGENCY & JOINT VENTURE

22.   DEFENDANTS CARNIVAL CORP. and CARNIVAL PLC are admittedly alter egos of each other and indistinguishable as the same entity and are therefore treated herein as DEFENDANT "CARNIVAL."

23.   DEFENDANTS CARNIVAL and PRINCESS are alter egos of each other such that the corporate form should be disregarded.

24.   "CARNIVAL has ownership and control over PRINCESS, which is organized under the dual-listed CARNIVAL presenting itself as Carnival Corporation & plc. CARNIVAL has claimed in filings with the Securities and Exchange Commission ("SEC") that it wholly owns PRINCESS as a subsidiary.[15]

25.   CARNIVAL and PRINCESS share the same Board of Directors and almost all of the same executive officers, and appear to use the same assets.

26.   CARNIVAL serves as the parent company for PRINCESS, which it calls a "Carnival Brand" cruise line and which CARNIVAL refers to as "part of our growing business." CARNIVAL exerts control over PRINCESS's business and day-to-day operations.

27.   CARNIVAL exerts dominion and control over PRINCESS's business and day-to-day operations as the parent company of PRINCESS, which CARNIVAL refers to as a "Carnival Brand" cruise line and part of CARNIVAL'S "portfolio of leading global, regional and national cruise brands."[16]

28.   According to its 2019 Annual Report, CARNIVAL is the owner of the *Coral Princess* and of all the cruise ships operated by the nine separately branded CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets.[17] Under Note 2, "Significant

---

[15] *See* Carnival Corporation Form 10-K ("Carnival 10-K") for the Fiscal Year Ended November 30, 2019, pp. 8, 10-11.
[16] Carnival Corporation & plc 2019 Annual Report, p. 1.
[17] Carnival Corporation & plc 2019 Annual Report, p. 7.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment," and again later in the report.[18] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public investors to invest in CARNIVAL stock. As the owner of the *Coral Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

29.     The CARNIVAL Board of Directors is empowered to make decisions governing the operation of PRINCESS, and PRINCESS makes use of CARNIVAL assets in conducting cruise operations.[19]   CARNIVAL has the right to choose the officers of PRINCESS. PRINCESS does not have its own independent board of directors. CARNIVAL could, if it chose, dissolve and wind up PRINCESS on its own initiative regardless of any contrary desire not to do so on the part of PRINCESS or any of the officers of PRINCESS.

30.     Among the shared officers of CARNIVAL and PRINCESS is Dr.  Grant Tarling, who by his own admission serves as "Senior Vice President and Chief Medical Officer" for five cruise lines owned by CARNIVAL, including PRINCESS, Carnival Cruise Line, Carnival Australia, Seabourn, and Holland America.[20]   Dr.  Tarling serves at the direction of and in coordination with CARNIVAL.

31.     The decision by CARNIVAL and PRINCESS that PRINCESS cruises proceed as scheduled in February and March, 2020, after DEFENDANTS knew or should have known that the coronavirus was a global health threat, and the subsequent decision to suspend cruise operations, were made by executives of CARNIVAL and PRINCESS, including at the direction of and in consultation with CARNIVAL senior executives, President & Chief Executive Officer Arnold W. Donald, PRINCESS President Jan Swartz, and CARNIVAL and PRINCESS Senior Vice President and

---

[18] *Id.,* pp. 10-11, 17.

[19] *See id.,* p. 17 (listing "Ships" as CARNIVAL "Property and Equipment").

[20] Public LinkedIn profile of Dr. Grant Tarling, available at https://www.linkedin.com/in/grant-tarling/ (last accessed Sept. 12, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Chief Medical Officer Dr. Grant Tarling.[21]   CARNIVAL exercises dominion and control over PRINCESS, as it does over each of CARNIVAL's other cruise lines. CARNIVAL controls, operates, harmonizes, and coordinates the operations of PRINCESS and its other cruise lines to maximize benefits for CARNIVAL and its shareholders. CARNIVAL controls every aspect of operations for PRINCESS, including where to operate, what volume of cruises to offer or passengers to service in a given market, whether to invest in new routes, nor whether to continue or suspend services.  PRINCESS does not operate without authorization from CARNIVAL.

32.   According to its 2019 Annual Report, CARNIVAL has a single integrated operating budget for all of its cruise operations including all nine of its cruise lines. There are no separate books for PRINCESS. There is not even a single separate line item reflecting the separate operations and performance of PRINCESS. Consolidated financials are reported not by cruise line, but through a geographic sectoral approach that differentiates between the North America and Australia ("NAA") segment and Europe and Asia ("EA") segment, and then adds figures for "Cruise Support" and "Tour and Other." These figures are not broken down to reveal the separate performance of PRINCESS or any of the other CARNIVAL lines. The cruise lines are not deemed relevant for shareholder analysis or from the perspective of operating the integrated CARNIVAL business.

33.   CARNIVAL's 2019 Annual Report discloses "Capital expenditures of $3.8 billion for our ongoing new shipbuilding program," without differentiating among the cruise lines who will be operating the cruise ships once built. The Annual Report also refers to a single "shipbuilding contract" and lists currency risk associated with the new PRINCESS-operated *Enchanted Princess* on the same table of figures

---

[21] A. Carr & C. Palmieri, "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going," *Bloomberg BusinessWeek,* April 16, 2020, available at*: https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/* (last accessed Sept. 14, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

as the new Carnival Cruise Lines-operated *Mardi Gras.*[22] Sales of ships are reported without reference to cruise line affiliation; for sold ships CARNIVAL reports only the passenger capacity and whether the ship is in the NAA segment or EA segment.[23]

34.     To the extent assets are assigned to or held by PRINCESS if at all, such activity is controlled and dictated by CARNIVAL. PRINCESS does not have the right to retain its own profits. CARNIVAL may freely assign assets and funding among its subsidiaries including by assigning them to or removing them from control of PRINCESS. Transactions between CARNIVAL and PRINCESS and between and among PRINCESS and the other subsidiaries of CARNIVAL are not true arm's length agreements and are for the benefit of and at the direction of CARNIVAL, to the exclusion of advancing any independent interest of PRINCESS or any of the other CARNIVAL subsidiaries.

35.     Public investors cannot invest separately in PRINCESS, which has no publicly traded stock of its own.  Rather, investors must invest in the dual-listed CARNIVAL, in either Carnival Corporation (CCL) or Carnival plc (CUK) on the New York Stock Exchange or in Carnival plc (CCLL) on the London Stock Exchange. There are no public shares of PRINCESS available to trade because PRINCESS is owned and controlled entirely by CARNIVAL and is a mere instrumentality of CARNIVAL.[24]

36.     Following the Federal Reserve's decision to increase the size of its lending program and thereby enable hedge funds to buy up corporate bonds at much lower interest rates, CARNIVAL has shored up its finances via a massive infusion of nearly $6 billion in cash. CARNIVAL is therefore well-capitalized despite the suspension of operations at all nine of its cruise lines.[25]

---

[22] *Id.* at 28; 59-60.
[23] *Id.* at 17.
[24] *See* Princess website, "For Investors" at *https://www.princess.com/aboutus/investors/index.jsp* (last accessed Sept. 12, 2020).
[25] M. Matousek, "The Fed may have saved Carnival from having to pay over 15% interest on its new bonds," *Business Insider,* Apr. 27, 2020, at

37.     The same may not be true for PRINCESS, however. PRINCESS suspended operations as of March 12, 2020 and still cannot operate legally under current government orders, and therefore has not had access to its usual source of revenue.[26]

38.     PRINCESS has been the hardest hit of the CARNIVAL cruise lines and perhaps of all cruise lines globally by the pandemic, as PRINCESS has this year faced coronavirus outbreaks aboard the *Diamond Princess, Ruby Princess,* and *Grand Princess* in addition to the *Coral Princess* cruises at issue here. While over 40 cruise ships have experienced coronavirus outbreaks during the pandemic, four have been PRINCESS cruise ships, and those four include the three causing the most deaths among all cruise ships globally. As of early September 2020, of 88 known fatalities resulting from cruise ship coronavirus outbreaks globally, 52 deaths have resulted from cruises operated by PRINCESS.[27] Therefore there is a heightened but plausible

---

*https://www.businessinsider.com/carnival-faced-higher-interest-rate-new-debt-before-fed-action-2020-4?op=1* (last accessed Sept. 12, 2020).

[26] C. Hansen, "Princess Cruises Suspends Service for Two Months Amid Coronavirus Pandemic," U.S. News. & World Report, Mar. 12, 2020, at *https://www.usnews.com/news/national-news/articles/2020-03-12/princess-cruises-suspends-service-for-two-months-amid-coronavirus-pandemic* (last accessed Sept. 12, 2020); Centers for Disease Control and Prevention, "Quarantine and Isolation: Cruise Ship Guidance," updated July 16, 2020, at *https://www.cdc.gov/quarantine/cruise/index.html* (last accessed Sept. 13, 2020) (extending government shutdown of cruise industry through September 30, 2020).

[27] *See https://www.miamiherald.com/news/business/tourism-cruises/ article241914096.html;* https://www.abc.net.au/news/2020-08-14/ruby-princess-coronavirus-inquiry-findings-handed-down/12557714; *"Placer County announces death of patient with COVID-19 | Placer County, CA". Placer.ca.gov.* March 4, 2020 (Retrieved May 6, 2020); *"Lawsuit over death of retired Dallas firefighter says cruise line failed to warn of outbreak". Dallas News.* April 15, 2020; *Evan Webeck* (April 3, 2020)*. "Coronavirus: Grand Princess crew member dies in SF hospital". Mercurynews.com.* Retrieved May 6, 2020; *Merlin, Michelle. "'It's been a nightmare': Family recalls Whitehall man's final days after contracting coronavirus on Grand Princess cruise". mcall.com;* "Man in his 70s, Grand Princess passenger, Marin County's first COVID-19 death | KTVU FOX 2". *Ktvu.com.* Retrieved May 6, 2020 (last accessed Sept. 25, 2020); *see generally* "COVID-19

risk that PRINCESS may be unable to cover all the claims against it to compensate for these injuries absent financial contribution from its alter ego corporate parent CARNIVAL.

39.   While the coronavirus was spreading globally, and cruise ship passengers were becoming ill and dying, including passengers of CARNIVAL and PRINCESS, certain CARNIVAL directors and officers sold significant volumes of their CCL stock in January and February 2020.  They sold their stock at a time when they were in a unique position to understand the significance and severity of the pandemic in a way that the broader public and public investors would not know. In particular, CARNIVAL President & CEO Arnold Donald sold 24,699 shares of CCL stock on February 14, 2020, at the operative share price of $42.9341, netted him a payday of  $1,060,429.34. Such transactions taking money out of the company may impact the ability of CARNIVAL and of PRINCESS to pay meritorious claims.[28]

40.   As alleged herein, CARNIVAL exercises total domination over PRINCESS to the extent that PRINCESS manifests no separate corporate interests of its own.

41.   As alleged herein, treating CARNIVAL and PRINCESS as separate corporate entities works injustice upon PLAINTIFFS – innocent third parties.

42.   At all times alleged herein, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other DEFENDANTS named herein, were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each DEFENDANT has ratified and approved the acts of each of the remaining DEFENDANTS.  Each of the DEFENDANTS aided

---

pandemic on cruise ships," and sources cited, https://en.wikipedia.org/wiki/COVID-19_pandemic_on_cruise_ships (last accessed Sept. 12, 2020).

[28] Carnival Corp., Statement of Changes in Beneficial Ownership (Form 4), Table I (Feb. 19, 2020).

1   and abetted, encouraged, and rendered substantial assistance to the other

2   DEFENDANTS in breaching their obligations to PLAINTIFFS, as alleged herein.  In

3   taking action to aid and abet and substantially assist the commission of these wrongful

4   acts and other wrongdoings complained of, as alleged herein, each of the

5   DEFENDANTS acted with an awareness of his/her/its primary wrongdoing and

6   realized that his/her/its conduct would substantially assist the accomplishment of the

7   wrongful conduct, wrongful goals, and wrongdoing.

8   **III.   JURISDICTION & VENUE**

9         43.   This court has jurisdiction over this matter pursuant to California Code

10  of Civil Procedure § 395, because at all times relevant, DEFENDANTS, and each of

11  them, resided in and/or did business in the State of California and the events which

12  combined to produce the injuries sustained by PLAINTIFFS occurred in the County

13  of Los Angeles, State of California. DEFENDANTS do substantial business in

14  California. DEFENDANT CARNIVAL, by and through its subsidiary, PRINCESS,

15  markets cruise vacations to California residents. Both main a headquarters in Santa

16  Clarita, California, and employ thousands of California residents to work there,

17  including Dr. TARLING who maintains an office at the Santa Clarita headquarters.

18  PRINCESS directly markets and sells air travel to passengers located throughout

19  California to convey said passengers to the boarding locations of DEFENDANTS'

20  cruises. Moreover, the claims asserted herein arise from DEFENDANTS' contacts

21  with California, including the sale of air travel to PLAINTIFFS who were at the time

22  of purchase located within California. Each of these facts independently, but also all

23  of these facts together, are sufficient to render the exercise of jurisdiction by this Court

24  over DEFENDANTS, and/or each of them, permissible under traditional notions of

25  fair play and substantial justice.

26        44.   Venue is proper in the County of Los Angeles because a substantial part

27  of the events, acts, omissions and/or transactions complained of herein occurred in

28

1   and/or originated from Los Angeles County, State of California. The amount in

2   controversy exceeds the jurisdiction minimum of this court.

3        45.    Additionally, each of the DEFENDANTS, purports to be a party to the

4   Passage Contract, which purports to name Los Angeles County Superior Court as the

5   proper venue for actions against DEFENDANTS where federal courts lack subject

6   matter jurisdiction, including in cases involving death arising inside the United States

7   where diversity of citizenship between parties does not exist. The Passage Contract

8   also purports that California law shall apply to such cases. PLAINTIFFS, however,

9   do not concede the enforceability of the Passage Contract. Nevertheless, by naming

10   this Court as a proper venue, DEFENDANTS have consented to personal jurisdiction

11   in this Court.

12   **IV.    FACTUAL ALLEGATIONS**

13        **A.    THE CRUISE SHIP INDUSTRY REAPS MASSIVE PROFITS**

14             **BY SELLING LUXURY TRAVEL TO AMERICANS**

15        46.    Today's CARNIVAL grew out of Carnival Cruise Lines, a cruise line

16   formed in 1972 by Israeli business magnate Ted Arison. Operations began with a

17   single cruise ship, and rapidly expanded on the strength of Arison's vision of

18   rebranding and marketing luxury cruises to a vacation option accessible to the general

19   public. Arison gained full control of the company in 1974.  By 1987, Carnival evolved

20   into the industry leader and went public.

21        47.    Expansion continued thereafter, spurred on by major acquisitions.

22   CARNIVAL acquired the Holland America Line in 1989, Seabourn in 1992, top

23   European cruise line Costa Cruises in 1997, and the Cunard Line in 1998. Then in

24   April 2003, CARNIVAL merged with P&O Princess Cruises plc, thereby bringing

25   within the CARNIVAL corporate ambit the additional Princess, P&O Cruises, P&O

26   Cruises Australia, AIDA Cruises, Ocean Village, and Swan Hellenic cruise lines.

27

28

48.     CARNIVAL operates "nine cruise lines with over 102 ships, carr[ies] 12 million passengers annually, and the corporation represents 50% of the global cruise market." [29]

49.     As CARNIVAL itself acknowledges, this extraordinary degree of consolidation is not readily apparent. As stated on its website, "Carnival's unprecedented rise to the world's largest cruise operator can be attributed to its ability to manage brand autonomy, with each major cruise line maintaining separate sales, marketing and reservation offices, as well as through the industry's most aggressive shipbuilding program."[30]

50.     Based on its 2019 Annual Report, CARNIVAL is the owner of the *Coral Princess* and of all the cruise ships operated by the nine separately branded CARNIVAL cruises lines, including PRINCESS. CARNIVAL lists some $38 billion in "Property and Equipment, Net" on its consolidated balance sheets as assets of CARNIVAL, out of a grand total of $45 billion in assets.[31] Under Note 2, "Significant Accounting Policies," CARNIVAL lists "Ships" as the first category of assets within the section on "Property and Equipment."[32] Ownership of these assets forms a significant part of the basis for CARNIVAL's valuation and inducement for public investors to invest in CARNIVAL stock. As the owner of the *Coral Princess,* CARNIVAL owes a direct, non-delegable duty of care to passengers aboard the ship.

51.     The scope of CARNIVAL's operations is massive. CARNIVAL bills itself as "the world's largest leisure travel company" and trumpets its status as "among the most profitable and financially strong in the cruise and vacation industries." In Fiscal Year 2019 CARNIVAL's operations reaped over $20.8 billion in revenue and generated nearly $3 billion in profit.[33]

---

[29] https://www.carnivalcorp.com/corporate-information/mission-and-history (last accessed June 5, 2020).
[30] *Id.*
[31] Carnival Corporation & plc 2019 Annual Report, p. 7.
[32] *Id.,* pp. 10-11.
[33] Carnival Corp. & plc 2019 Annual Report, p.1. (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

52.     As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But three players — Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD — control[led] roughly 75% of the market."[34] "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018."

53.     "In 2011, three-quarters of the nearly 16 million cruise bookings worldwide were made from the United States, according to the industry group Cruise Lines International Association, which represents 26 cruise lines, including the world's largest, Carnival and Royal Caribbean."[35]

54.     And "[i]n 2018, 28.5m passengers — the bulk of them from America — spent more than $46B on cruises globally."[36]

## B.     DEFENDANTS KNEW COVID-19 WAS HIGHLY CONTAGIOUS AND DEADLY BEFORE INVITING PLAINTIFFS TO BOARD THE *CORAL PRINCESS*

55.     The cruise industry has a well-documented problem with the spread of disease on board cruise ships, so much so that the United States Centers for Disease Control and Prevention (CDC) maintains a Vessel Sanitation Program to inspect cruise ships and report and track onboard viral outbreaks.

56.     Since 1994, PRINCESS cruise ships have hosted over 50 outbreaks of norovirus and other pathogens, and other CARNIVAL lines have experienced countless others.

/ / /

/ / /

---

[34] https://thehustle.co/the-economics-of-cruise-ships/ (last accessed June 5, 2020).
[35] https://www.cnn.com/2013/02/13/opinion/walker-cruise-ships/index.html (last accessed June 5, 2020).
[36] https://thehustle.co/the-economics-of-cruise-ships/ (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

37

57.     To assuage potential passengers' concerns about viruses on board, CARNIVAL'S website also touts its Health, Environmental, Safety, Security, and Sustainability Policy, highlighting that CARNIVAL and its operating lines (including PRINCESS) "are committed to protecting the health, safety, and security of our passengers, guests, employees, and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss." [38]

/ / /

/ / /

---

[37] https://www.cruisecritic.com/photos/ships/coral-princess-278/balloon-drop-party-399174/balloon-drop-party--v17735161/ (last accessed June 5, 2020).

[38] https://www.carnivalplc.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

39

58.    CARNIVAL confirms this commitment on its website, offering the following assurance on a page bearing the caption, "Carnival's Commitment to Guest and Crew Health":

> Carnival Cruise Line's highest responsibilities include the health and safety of our guests and crew. Coronavirus is a fluid situation and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus). Our monitoring, screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.[40]

---

[39] https://www.cruisecritic.com/photos/ships/coral-princess-278/universe-lounge-396741/universe-lounge--v17734502/ (last accessed June 5, 2020).

[40] https://www.carnival.com/health-and-sailing-updates (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

59.     CARNIVAL employs Dr. TARLING both directly and through PRINCESS, and he is touted by both as an expert on policies and procedures to prevent the spread of communicable diseases on CARNIVAL'S more than 100 cruise ships. TARLING is responsible for public health concerns for CARNIVAL and PRINCESS as Group Senior Vice President and Chief Medical Officer, to serve in that capacity for both companies.  He is a medical doctor and according to the website, "earned an Executive Master of Public Health degree in Health Care Management and Policy, and Global Health certification from [UCLA]." In addition, in "2016, he was elected for a second, four-year term as Chair and Chair-Elect of the Cruise Ship Medicine Section of the American College of Emergency Physicians.  In that role, he vigorously championed best-practice healthcare guidelines that have been adopted by the Cruise Line International Association (CLIA) whose members represent 95% of the world's cruise lines."  According to Dr. TARLING, a ship's medical facility is not a mere first-aid clinic.  "Each ship's modern medical center has a physical infrastructure that allows provision of a broad range of both ambulatory care services and inpatient hospital services, including an ICU.  It has a self-contained pharmacy, lab and imaging, which is staffed by a small physician-led clinical team."  He oversees about 800 clinical staff working at sea who are supported by about 50 staff in the U.S. between Los Angeles, Miami, and Seattle.[41]

60.     The coronavirus now known as SARS-CoV-2 first appeared in Wuhan, Hubei Province within the People's Republic of China in December 2019.

61.     National Geographic reported on February 18, 2020, that "[f]or most patients, COVID-19 begins and ends in their lungs, because like the flu, coronaviruses are respiratory diseases."[42] And labeled respiratory failure as "the defining signature of severe cases".

---

[41] https://americanhealthcareleader.com/2018/how-grant-tarling-navigates-healthcare-for-8-million-travelers/ (last accessed June 5, 2020).

[42] https://www.nationalgeographic.com/science/2020/02/here-is-what-coronavirus-does-to-the-body/#close (last accessed June 5, 2020).

**COMPLAINT**                                                                                                21

62.     CNN reported on February 19, 2020, regarding the results of the most extensive and comprehensive study of the coronavirus performed by China's CDC and published in *The Chinese Journal of Epidemiology* two days prior. "**It found that the novel coronavirus is more contagious than the related viruses which cause SARS and MERS. While the resulting disease, Covid-19, is not as fatal on a case-by-case basis, its greater spread has already led to more deaths than its related coronaviruses.**"[43] "**Because the Covid-19 virus has infected far more people than the viruses that caused SARS and MERS, the number of people who have died from it so far has already overtaken both viruses.**"[44]

63.     On February 20, 2020, NPR reported "[m]ore than 75,000 COVID-19 cases have been confirmed worldwide, according to a disease-tracking dashboard created by the Johns Hopkins Whiting School of Engineering. The virus has killed more than 2,000 people … ."[45]   The same article reported that "[t]he number of confirmed COVID-19 cases in South Korea has doubled in just 24 hours, to 104 from 51" according to the Korea Centers for Disease Control and Prevention.

64.     Any lingering doubt about the direct and specific danger the coronavirus posed to cruise ships went away with the highly publicized outbreak aboard the *Diamond Princess*, another of DEFENDANTS' cruise ships, several weeks earlier. The *Diamond Princess* had been under quarantine at Yokohama's port near Tokyo since February 3, and as of February 20, 2020, the global press was reporting that two passengers on that cruise ship had died from COVID-19. "Both of the passengers died about *a week after tests confirmed they were infected* with the respiratory virus." And further, "**[a] total of 634 people from the *Diamond Princess* have tested positive**

---

[43] https://www.cnn.com/2020/02/19/health/coronavirus-china-sars-mers-intl-hnk/index.html (last accessed June 5, 2020).
[44] Id.
[45] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**for COVID-19**, the Japanese agency said. **More than half that number are identified as "asymptomatic pathogen carriers," meaning that while they don't show signs of the illness, they can still transmit the disease to others or become sick themselves**."[46] An NPR article reporting on the tragedy also stated: "When passengers test positive for the novel coronavirus, they're taken off the *Diamond Princess* and sent to local hospitals. **Those diagnoses also reset the 14-day quarantine period** *for their traveling partners and close contacts*."[47]

65.  Accordingly, the United States CDC issued the following Media Statement regarding the *Diamond Princess* outbreak on February 18, 2020:

> *CDC believes the rate of new reports of positives new on board, especially among those without symptoms, highlights the high burden of infection on the ship and the potential for ongoing risk.*

66.  Nevertheless, DEFENDANTS, and/or each of them, disregarded this crucial information when knowingly faced with another likely COVID-19 positive passenger on a different cruise ship—the *Grand Princess*—an outbreak DEFENDANTS first acknowledged publicly on March 4, 2020, though they had been aware of it sometime earlier.

67.  Prior to February 21, 2020, the *Grand Princess* had been on a roundtrip cruise from San Francisco to Mexico. The Mexico cruise departed from San Francisco on February 11, 2020, and was scheduled to return to San Francisco on February 21, 2020, when the *Grand Princess* was scheduled to off-load some passengers and on-board some new passengers, then set sail to Hawaii.

---

[46] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed June 5, 2020).

[47] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi (last accessed June 5, 2020).



48

68.    On February 20, 2020, the infected passenger aboard the *Grand Princess* visited that cruise ship's medical center to seek treatment for symptoms including "acute respiratory distress." Medical personnel aboard the ship, as well as responsible executives at CARNIVAL and PRNCESS including Dr. TARLING, knew or should have known that the symptoms were consistent with those suffered by passengers infected with SARS-Cov-2 aboard the *Diamond Princess* and others infected by the coronavirus around the world, as reported widely in medical circles and the popular press.

69.    Dr. TARLING in fact later admitted that a passenger aboard the earlier *Grand Princess* Mexico cruise fell ill within "two or three days" of boarding the ship, and that the timing of when the passenger's symptoms first appeared indicates he

---

48 *Grand Princess*-The Atrium-https://www.cruisecritic.com/photos/ships/grand-princess-54/member-8/36093/ (last accessed June 5, 2020).

**COMPLAINT**                                                                                    24

brought the coronavirus onboard when he boarded the ship on February 11, 2020. [49] Dr. TARLING added that while onboard, the passenger had a "six-to-seven day history of symptoms of acute respiratory illness." [50]

70.     Despite this information, DEFENDANTS, and/or each of them, off-boarded the sick passenger and boarded new passengers onto the *Grand Princess* ship in San Francisco on February 21, 2020, without providing any notice or warning to passengers and without instituting any safety precautions. Notably, approximately 62 passengers and 1,000 crew members from the Mexico leg of the trip who had traveled with the sick passenger for over a week did not disembark in San Francisco and continued on the trip to Hawaii.

71.     As of the week the *Coral Princess* set sail, U.S. officials had announced 21 confirmed COVID-19 cases aboard the *Grand Princess* which was currently moored off the coast of California.[51]



San Francisco police escort the coronavirus-stricken Grand Princess on its way to dock at the Port of Oakland on March 9.

Jane Tyska | Bay Area News Group | TNS

[49] "Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland," The New York Times, March 9, 2020, updated March 12, 2020. (last accessed June 5, 2020).
[50] "Cruises Set Sail Knowing the Risk," The Wall Street Journal, May 2, 2020. (last accessed June 5, 2020).
[51] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

72.     As a result, "The U.S. Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC.  The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as anyone who reports feeling feverish."[52]   That CARNIVAL passenger died in Placer County, California on March 4, 2020.



[53]

73.     Once equipped both with their previously existing awareness of their cruise ships' susceptibility to virus outbreaks and with the specific knowledge that two of its cruise ships, the *Diamond Princess* and *Grand Princess,* had succumbed to onboard outbreaks of SARS-CoV-2, DEFENDANTS chose not to suspend or change operations, but rather made the inexplicable decision to press forward in the same manner, just "doing business as normal" and place their passengers at further risk of infection, with no further precautions and for the sake of profit.

74.     Even as DEFENDANTS through Dr. TARLING confirmed the *Grand Princess* outbreak, operations continued unabated throughout the rest of the fleet, and on March 5, 2020 without so much as a warning to passengers DEFENDANTS

---

[52] Id.
[53] https://news.sky.com/story/coronavirus-21-people-stranded-on-grand-princess-cruise-ship-test postive-for-covid-19-11951315. (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  boarded the *Coral Princess* at San Antonio, Chile and proceeded on a two-week South

2  American cruise.



54

14      75.     Notably, less than a week later on March 12, 2020, DEFENDANTS made

15  the decision to suspend all cruises due to COVID-19:

> Shares of Carnival Corp. plunged by more than 31% Thursday after its **Princess Cruises line announced it was immediately suspending all operations for two months due to concerns over the rapidly spreading COVID-19 pandemic**.
>
> The announcement impacts the cruise line's fleet of 18 ships, the company said, and will affect voyages from Thursday to May 10. **Princess Cruises President Jan Swartz said the company is taking the "bold action" to reassure investors of its commitment to the well-being of its passengers.**
>
> …
>
> Current Princess voyages that are underway and scheduled to end before March 17 will carry on as planned, the company said. **Voyages that extend beyond March 17 will be ended at the "most convenient location for guests," the company added**.
>
> …

---

54 https://www.mercury.news.com/2020/03/09/photos-coronavirus-stricken-grand-princess-arrives-at-port-of-oakland/. (last accessed June 5, 2020).

**"We've been asked, and we've asked ourselves, why COVID-19 seems to be impacting Princess so heavily,"** Swartz said in a video shared on YouTube. "We don't really know."

The State Department earlier this week issued an official advisory for Americans, especially those most vulnerable to COVID-19, which includes those with underlying health conditions, to "not travel by cruise ship."[55]

76.    In addition, it was widely reported that earlier in the week (i.e. within days of the *Coral Princess* boarding passengers and disembarking), DEFENDANTS, and/or each of them, had attended a meeting at the White House with the Vice President to discuss the needs for safety reform in the cruise ship industry due to the health risks exposed by COVID-19:

> **Representatives of the cruise ship industry have met with White House officials, including Vice President Mike Pence, to discuss a coordinated response to COVID-19, Carnival Corp. spokesman Roger Frizzell said** *earlier this week*.

> "**We made it very clear that we needed cruise lines to be safer; to establish and to embrace new protocols; screening onboard, screening off; new medical protocols; shipboard processes for evacuating people that may contract coronavirus or a serious illness**," **Pence said at a news briefing on Monday**. "We're going to work with the cruise line industry to improve the safety, improve the health environment on cruise lines, in the short term and in the long term."

> California Gov. Gavin Newsom said earlier this week that he is weighing cruise restrictions along the California coast as he awaits new federal guidelines for the industry. **He said cruise operators should, in the mean time, introduce aggressive requirements for travelers "at the peril of that industry collapsing**."[56]

---

[55] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

[56] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

77.   To make matters worse, DEFENDANTS, and/or each of them, were made aware of this anticipated meeting with White House officials at the latest on March 2, 2020, i.e. three days before *Coral Princess* boarded passengers and disembarked, indicating notice and/or knowledge by DEFENDANTS, and/or each of them, of the severity of the health risk to passengers on cruise ships as of that date at the latest. As reported by Reuters on March 2, 2020:

> The White House will hold meetings this week with top executives from U.S. airlines and the cruise industry amid the growing coronavirus outbreak, a spokeswoman for Vice President Mike Pence confirmed on Monday.
>
> …
>
> Pence's office said he will meet on Saturday with cruise line chief executives in Florida.[57]

**C.   DESPITE KNOWING THEIR CRUISE SHIPS WERE ARMED WITH A CONTAGIOUS AND DEADLY VIRUS, DEFENDANTS INVITED PLAINTIFFS TO BOARD THE SHIP AND FAILED TO TAKE ANY SAFETY PRECAUTIONS OR WARN PASSENGERS**

78.   DEFENDANTS, and/or each of them, failed to take any safety precautions prior to and/or at the time of boarding passengers on the March 5, 2020 *Coral Princess* cruise.

79.   DEFENDANTS did not take measures to disinfect, sanitize, and/or decontaminate the *Coral Princess* ship and/or exposed surfaces prior to boarding passengers, including PLAINTIFFS, as they boarded in San Antonio, Chile.

80.   DEFENDANTS, and/or each of them, failed to warn, advise, and/or provide notice to the *Coral Princess* passengers prior to and/or at the time of their boarding flights to the cruise departure point, including the flight PLAINTIFFS boarded in San Francisco on February 28, 2020, or prior to or at the time of boarding

---

[57] https://www.reuters.com/article/us-health-coronavirus-airlines-whitehous/white-house-set-to-meet-with-senior-airline-cruise-industry-officials-idUSKBN20P2FC (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

the *Coral Princess* itself, of the system-wide risk posed to the DEFENDANTS' cruise ships by the rapidly spreading coronavirus.

81.     DEFENDANTS, and/or each of them, failed to subject any of the over 1,500 passengers or 878 crew members to any additional or enhanced medical or health screening procedures, including a COVID-19 test prior to sending them on a cruise where they would interact with one another in close quarters for over two weeks. DEFENDANTS, and/or each of them, conducted no additional inquiries or screening to identify and quarantine passengers who intended to board the *Coral Princess* after traveling from countries experiencing outbreak of the virus.

82.     DEFENDANTS, and/or each of them, failed to provide passengers, including PLAINTIFFS, with masks at the time of boarding and/or failed to implement any safety procedures for socializing on the cruise ship during travel, including social distancing and/or staying six feet apart from other unknown travelers.

83.     In addition, DEFENDANTS, and/or each of them, failed to make any adjustments and/or changes to how they off-board and on-board passengers to the cruise ship, and instead relied on practices where passengers off-boarding the ship come in close contact with passengers on-boarding the ship.

84.     DEFENDANTS, and/or each of them, proceeded as if everything was normal and nothing had changed, and the *Coral Princess* departed as scheduled on March 5, 2020.

### D.   DEFENDANTS MAKE THE LION'S SHARE OF THEIR PROFITS FROM ON-BOARD PASSENGER PURCHASES – NOT TICKET SALES

85.     As of 2018, "[t]he global market comprise[d] dozens of cruise lines and more than 250 ships. But 3 players — Carnival Corporation & PLC, Royal Caribbean Cruises LTD, and Norwegian Cruise Line HLD — control[led] roughly 75% of the market."[58]

---

[58] https://thehustle.co/the-economics-of-cruise-ships/ (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

86. "These companies, which preside over an empire of subsidiary cruise lines, collectively raked in $34.2B in revenue in 2018. Cruise ships make this money through two channels: Ticket sales and onboard purchases (e.g., alcoholic drinks, casino gambling, spa treatments, art auctions, and shore excursions), which passengers pay for with pre-loaded cruise cards and chip-equipped wristbands."[59]

87. "On average, tickets account for 62% of total revenue and onboard purchases make up the remaining 38%. **Though tickets represent a majority of revenue, *onboard purchases account for the lion's share of the profit*, according to several experts**."[60]

> **As a high fixed-cost business, a cruise ship relies on getting as many passengers as possible *on the ship*** — even at fire-sale rates. **The major cruise lines will often fill each ship to 105%-110% capacity, then upsell its captive consumers on additional services.**
>
> **"They have mastered the ability to get their hands into people's pockets and to take out every last dollar,"** says Ross A. Klein, a professor at Memorial University of Newfoundland, who has closely studied the cruise ship industry. "They can almost give a cabin away for free and still make a profit."
>
> …
>
> On average, a passenger will spend $1,060 ($151/day) on a ticket and $650 ($92/day) on onboard purchases. After subtracting overhead costs, a ship will make out with roughly $291 in net profit per passenger, per cruise.
>
> **That means that at full capacity, a single ship like Royal Caribbean's Symphony of the Seas might make $9.8m in revenue ($1.7m of which is profit) during one 7-day excursion. *That's $239k in profit per day at sea*.**[61]

88. This creates an obvious financial incentive for DEFENDANTS, and/or each of them, to knowingly board passengers on a cruise ship in the middle of a global

---

[59] Id.
[60] Id.
[61] Id.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

pandemic that created a substantial likelihood that each such cruise ship was armed with a deadly and highly contagious virus, despite having already secured the purchase price of each passenger's ticket. And that is what happened here.

### E.   DEFENDANTS DID NOT WARN OR ADVISE PASSENGERS OF THE VIRUS BEING ON-BOARD THE *CORAL PRINCESS* UNTIL THREE WEEKS AFTER BOARDING

89.   Despite all the signs of danger, PRINCESS in consultation with and with the full authorization of CARNIVAL embarked the South American cruise of the *Coral Princess* on March 5, 2020, as scheduled.

90.   The next day, March 6, 2020, CARNIVAL announced it would modify its typically onerous cancellation policies and offer credit for onboard purchasers who chose to continue with scheduled cruise travel through May 31, a move designed not to protect passengers but rather to entice passengers to continue with their travel plans despite the pandemic and thereby satisfy DEFENDANTS' primary objective, preserving their revenue stream.

91.   One week after the *Coral Princess* set sail from Chile, on March 12, 2020, DEFENDANTS finally acknowledged the pervasive nature of their coronavirus problem and suspended operations.

92.   And despite the announcement of the "pause," PRINCESS in consultation with and with the full authorization of CARNIVAL continued operating the *Coral Princess* cruise which was then underway. All that happened aboard that ill-fated cruise resulted directly from the decision taken by CARNIVAL, PRINCESS, and Dr. TARLING to embark on March 5 in the midst of a global pandemic. That initial decision severely limited options for passengers and crew alike and led directly to the injuries suffered by PLAINTIFFS and others aboard the *Coral Princess.*

93.   It appears that the first notification passengers received from DEFENDANTS that anything had changed did not come until March 14, 2020, nine days after departure. After that time, the *Coral Princess* no longer permitted

passengers to go ashore at their scheduled ports of call. PRINCESS in consultation with and with the full authorization of CARNIVAL advised that the ship would complete passage to the scheduled destination of Buenos Aires, Argentina, where it was expected that those disembarking could more easily connect with their planned onward travel. CARNIVAL, PRINCESS, and Dr. TARLING did not at this time call for any other heightened protective measures. Apart from the changed itinerary, life aboard the *Coral Princess* continued as usual.

94. On March 17, 2020, all passengers aboard the *Coral Princess* were given a temperature test. No other protective measures were imposed.

95. On that same day, statewide and local government orders took effect in California and touched off a wave of stay-at-home orders eventually affecting virtually the entire United States.

96. On March 19, 2020, the last day of the scheduled cruise, the *Coral Princess* landed at Buenos Aires. Chaos reigned, as PRINCESS, in consultation with CARNIVAL, and its agents issued seriatim, often conflicting statements about flight itineraries and the ability of various groups and of individual passengers to disembark the cruise ship. MR. and MRS. NAHM had an 11:58 am flight from Buenos Aires to New York, but were not allowed to disembark because the gangway was not opened so they missed their flight. The NAHM's were told by the ship's crew that the government in Buenos Aires would not allow anyone off the ship. They were told to book a later flight, which they did, but again, they were not allowed to disembark. In the afternoon, some 500 passengers, citizens of Argentina and Switzerland, and others were permitted to disembark. They departed from the cruise ship to the airport, only to be advised that their flights were cancelled and directed to return to the cruise ship because they did not have authorization to remain within Argentina.

97. According to earlier statements from PRINCESS at the direction of CARNIVAL, and/or each of them, the voyage was supposed to have ended and passengers were supposed to be able to choose where they disembark. PRINCESS in

consultation with and with the full authorization of CARNIVAL stated on March 12: "Current Princess voyages that are underway and scheduled to end before March 17 will carry on as planned, the company said. **Voyages that extend beyond March 17 will be ended at the "most convenient location for guests," the company added**."[62] That is clearly not what happened. In fact, it does not even seem that DEFENDANTS made any attempt between March 12th and March 17th to end the voyage for passengers, regardless of whether the location was convenient or not.  For MR. and MRS. NAHM any location would have been more convenient than being on that cruise ship.

98.    Later on March 19, 2020, passengers aboard the *Coral Princess* were informed that because the Argentine government had issued an order taking effect at midnight that would require any cruise ships to remain in port indefinitely, the *Coral Princess* would be departing immediately for its nominal home port in Fort Lauderdale, Florida. All 1,020 passengers, including some who had been returned to the ship following flight cancellations, departed Buenos Aires along with the 878 crew members.

99.    Only on March 19, 2020, the date when the cruise had originally been scheduled to conclude, did PRINCESS begin issuing status update reports for the *Coral Princess* as it had previously for the *Diamond Princess* and *Grand Princess*. Over the coming days these reports would track unsuccessful efforts to arrange for *Coral Princess* passengers to disembark as the ship made its way to Montevideo, Uruguay on March 21, toward a failed attempt to land at Rio de Janeiro, Brazil on March 24, and Bridgetown, Barbados on March 31, on its way to Fort Lauderdale.

100.    The communications by PRINCESS regarding the fate of the *Coral Princess* were meant to advise passengers and the public regarding its location, but were also carefully calibrated pretext designed to limit the scope of DEFENDANTS'

---

[62] https://www.cnbc.com/2020/03/12/carnivals-princess-cruises-to-pause-global-ship-operations-for-60-days-over-coronavirus.html (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

ultimate liability. During the first 19 days of what had originally been scheduled as a 14-day cruise, PRINCESS in consultation with and with the full authorization of CARNIVAL in official updates regarding the *Coral Princess* did not once mention the words "virus," "pandemic," or "COVID-19."

101.   On March 24, 2020, however—five full days after its first public statement—PRINCESS issued a new update announcing that Brazil had denied *Coral Princess* passengers authorization to disembark, and finally mentioned the global pandemic expressly. "There remains no known risk of COVID-19 onboard," the PRINCESS update stated. The update did not cite any source or disclose any facts in support of this self-serving pronouncement.

102.   On March 30, 2020, now eleven days after the scheduled conclusion of the cruise and 25 days after it began, a new PRINCESS update announced that the *Coral Princess* would be arriving in Barbados the following day to take on supplies, though no passengers would be permitted to go ashore. Once again, DEFENDANTS' official statement confirmed "There remains no known risk of COVID-19 onboard." DEFENDANTS knew or had reason to know this statement was materially misleading and intentionally omitted all reference to a very real known risk. By the time PRINCESS issued the March 30 update, several passengers had begun reporting feeling ill, and had begun testing passengers for the coronavirus. Because the *Coral Princess* did not have means on the cruise ship to determine test results, DEFENDANTS as of that time had no legitimate basis for stating that no known risk existed.

103.   Undeniable facts finally eclipsed DEFENDANTS' misrepresentations the following day, March 31, 2020, when a subsequent PRINCESS update reported "The medical center onboard *Coral Princess* has reported a higher-than-normal number of people presenting influenza-like symptoms." The carefully crafted message omitted the most salient fact, that DEFENDANTS as of that time had no capability to assess the presence of coronavirus and were therefore flying blind. The statement then

noted that many passengers "have tested positive for regular influenza, however given the concern surrounding COVID-19 (coronavirus), and out of an abundance of caution, guests have been asked to self-isolate in their staterooms and all meals will now be delivered by room service. Crew will remain in their staterooms when not working." This public statement was the first notification PLAINTIFFS and the other *Coral Princess* passengers had received about a viral outbreak on board the cruise ship, and until that time CARNIVAL, PRINCESS, and Dr. TARLING had still declined to impose any heightened protective measures. Up until that announcement, the passengers had still enjoyed free run of the ship.

104.    Meanwhile, unbeknownst and undisclosed to the passengers, the medical staff aboard the *Coral Princess* had transmitted test samples for 13 patients exhibiting potential COVID-19 symptoms to onshore authorities in Barbados.

105.    By April 1, 2020, the NAHMS had been captive onboard for almost two weeks since their 14-day cruise was scheduled to end on March 19. The NAHMS and all passengers aboard the *Coral Princess* had been kept completely in the dark by DEFENDANTS about the circumstances of their quarantine or when they would be returning home. After March 19, for most of that time onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed to congregate and socialize in crowds without any restrictions or safeguards. There was no mention of the coronavirus. But by April 1, a dream vacation had become a nightmare for the NAHMS, as they were both sick. The foregoing is described in more detail below, including the heart-wrenching video the NAHMS posted on social media voicing their fear about being onboard without information.

106.    On April 2, 2020, PRINCESS in another self-serving update announced publicly that it had sent these test samples "in response to a reported small cluster of cases of respiratory illness and in an abundance of caution." Whether "abundant" or not, the caution applied by DEFENDANTS had come too late, as fully 12 of the 13

individuals identified as symptomatic—7 passengers and 5 crew—had in fact tested positive for COVID-19.

107.   By April 3, 2020, two passengers had died on board from complications due to COVID-19. These deaths were not disclosed in DEFENDANTS' official updates.

108.   Meanwhile, Coast Guard officials denied permission for the *Coral Princess* to land at Fort Lauderdale due to "an unacceptable risk of medical emergency due to the inherent and high probability of transmission of COVID-19 aboard."



**Coral Princess cruise ship.**   Joe Raedle/Getty Images)

109.   Passengers were finally allowed to land on April 4, 2020, at PortMiami in Miami, Florida. Another chaotic situation developed. Several passengers requiring immediate medical attention were transported to local hospitals via ambulance. Full disembarkation did not begin until two days later, April 6, 2020.

/ / /

/ / /

**Coral Princess cruise ship.** Joe Raedle/Getty Images)

### F.    PLAINTIFFS' DREAM VACATION TURNED INTO A NIGHTMARE AFTER DEFENDANTS UNLOAD PASSENGERS TO SUFFER AND DIE ON LAND

110.   GRACE and PETER NAHM have been married for 43 years.  They were born and raised in Seoul, South Korea and married there in 1976.  They have two children, a daughter and son.  PETER NAHM has worked in the insurance industry since 1976, and since 1991, has owned his own insurance brokerage serving clients in New York and New Jersey.  The NAHMS' hard work and stability epitomize the American immigrant success story.   They have always been active and healthy individuals who enjoy golf, hiking and travel.

111.   Every year, the NAHM's plan a trip with MR. NAHM'S high school friends to far and exotic places.  They had been on four prior Princess cruises to Japan, Mexico, Southern Europe, Canada and New England.  For 2020, they planned a cruise on the *Coral Princess* to South America and Antarctica from March 3 to 19, 2020 to sites in Chile, Argentina and Uruguay. The cruise was ten months in planning, for 62

friends, including 48 from South Korea and 14 from the U.S., including the NAHM'S. The NAHMS paid US $3,219.00 each for their cruise, totaling $6,438.00.

112. Approximately two weeks before the *Coral Princess's* scheduled departure on March 5, 2020, DEFENDANTS notified passengers with South Korean passports that they would not be allowed on the cruise, due to coronavirus-related travel restrictions imposed by the South Korean government, so the NAHMS' 48 South Korean friends were forced to cancel their trip. The NAHMS' attempts to cancel the cruise prior to the March 5 departure were denied.

113. Per the PRINCESS Booking Confirmation, from the time of booking PLAINTIFFS were immediately subject to an aggressive regime of cancellation penalties under which they would forfeit 20% of the purchase price starting 89 days before the departure date, or December 7, 2019; 50% of the purchase price starting 56 days before the departure date, or January 9, 2020; 75% as of February 6, 2020, four weeks before departure; and 100% as of February 20, 2020, two weeks from departure. Reports of virus outbreaks aboard DEFENDANTS' cruise ships including the *Diamond Princess* and *Grand Princess* intensified throughout this period, even as their severity was downplayed by DEFENDANTS, such that any passenger seeking to cancel would be subject to greater and greater penalties as the situation worsened. DEFENDANTS finally announced that it would provide some relief from this regime of onerous penalties, but only on March 6, 2020—the day after the *Coral Princess* departed from San Antonio, Chile.

114. DEFENDANTS' decision to prohibit South Korean passengers from boarding the *Coral Princess* cruise in South America coincided with reports on February 20, 2020, that South Korea had raised it coronavirus alert to the "highest level" because there was a surge in infectious cases.[63] Furthermore, by March 12, 2020 Argentina prohibited flights from South Korea and by March 18, required South

---

[63] https://www.npr.org/sections/goatsandsoda/2020/02/20/807745305/coronavirus-2-princess-diamond-cruise-ship-passengers-die-after-contracting-covi; https://www.bbc.com/news/world-asia-51603251 (last accessed August 28, 2020).

Korean nationals entering Argentina to quarantine for 14 days to limit the spread of the coronavirus.[64]

115.   Since they could not cancel their cruise without forfeiting payment, the NAHMS felt they had no choice but to go on the cruise.  On March 5, 2020 the NAHMS and their 14 remaining friends boarded the *Coral Princess* in San Antonio, Chile, and set sail for Puerto Montt.  From March 6 to 13, the NAHMS and the other passengers sailed from Chile to the Amalia Glacier, to Ushuaia, Argentina, around Cape Horn, and on March 14, were sailing toward the coastal city of Puerto Madryn, Argentina.  Until March 14, 2020 the cruise proceeded as scheduled.

116.   On the evening of March 14, 2020, the captain's broadcast by intercom throughout the *Coral Princess* advised passengers of a schedule change, notably that the March 15 call to Puerto Madryn was aborted and no shore leave would be granted.  No further explanation was given.

117.   Captain's broadcasts advising passengers of cancelled ports of call became common while the *Coral Princess* remained at sea from March 15 to 19, 2020.  But onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed to congregate and socialize in crowds without any restrictions or safeguards.  There was no mention of the coronavirus.

118.   On March 15, 2020, the captain's broadcast reminded passengers that the call to Puerto Madryn, Argentina was cancelled, but no further explanation was given.

119.   On March 16, 2020, the captain's broadcast announced that the *Coral Princess* was heading to Buenos Aires to try allowing passengers to disembark in Buenos Aires, but no other information was provided.  From March 16 to March 19, the *Coral Princess* remained at sea. Onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed to congregate and

---

[64]  https://www.pwc.com/sg/en/tax/assets/covid19-information-on-travel-restrictions.pdf (last accessed August 28, 2020).

**COMPLAINT**                                                                                           40

socialize in crowds without any restrictions or safeguards. There was no mention of the coronavirus.

120. March 19, 2020 was supposed to be the last day of the cruise. At 1:00 p.m., the *Coral Princess* arrived in Buenos Aires. By then, the NAHM's had already missed their 11:58 a.m. flight home and were not allowed to disembark. At 4:00 p.m., passengers began to disembark and head for the airport to catch their flights home. However, 160 passengers missed their flights and returned to the ship. At midnight, the Captain's broadcast informed passengers that the *Coral Princess* would depart Buenos Aires for Uruguay, but no other information was provided. This was the first time they heard about a pandemic but there was no mention of the coronavirus onboard.

121. On March 20, 2020, the *Coral Princess* arrived in Uruguay but was denied anchor. Onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed to congregate and socialize in crowds without any restrictions or safeguards. There was no mention of the coronavirus.

122. From March 21 to 23, 2020, the *Coral Princess* remained at sea. The Captain's broadcast informed passengers that the ship would head to Rio de Janeiro, Brazil. Throughout this time onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed to congregate and socialize in crowds without any restrictions or safeguards. There was no mention of the coronavirus.

123. On March 24, 2020, the *Coral Princess* arrived in Rio de Janeiro at 4:00 p.m., but was denied anchor. At 6:00 p.m., the captain's broadcast informed passengers that the *Coral Princess* was heading for Miami, Florida. No further explanation was given to the passengers.

124. Up until March 26, 2020, the NAHMS made the best of remaining on the *Coral Princess* along with all of the other passengers. Onboard the *Coral Princess*, restaurants remained open, activities continued as usual, and passengers were allowed

1   to congregate and socialize in crowds without any restrictions or safeguards. There
2   was no mention of the coronavirus. The NAHMS and their friends participated in a
3   golf putting tournament, ukulele lessons, and made the best of being onboard as they
4   were told they were heading back to the United States.

5       125.   Everything changed for the NAHMS by the evening of March 26, 2020,
6   when MRS. NAHM became ill with a fever and cough. MR. NAHM felt ill the next
7   day, March 27, with a fever, cough and diarrhea.

8       126.   On March 28, 2020, MR. and MRS. NAHM went to the *Coral Princess's*
9   medical center where they were told they had the A-1 influenza, given medication,
10  and sent back to their stateroom. On March 29, a nurse came to their stateroom to
11  check their temperatures, told them she would return, but never returned. The medical
12  staff instructed the NAHMS to stay in their stateroom.

13      127.   On March 31, 2020, PRINCESS issued its official *Coral Princess* update
14  announcing an influenza outbreak on board. Communications issued aboard the ship
15  advised passengers exhibiting symptoms to call an extension to report to the medical
16  center. By that date, the NAHMS were both very sick, and went to the medical center
17  where they were given a nose swab but not told why. They later learned they were
18  tested for COVID-19.

19      128.   On April 1, 2020, the NAHMS posted on social media a video they made
20  from their stateroom on the *Coral Princess.* In the heart-wrenching 57 second video,
21  MR. NAHM introduced himself and MRS. NAHM, stating they have been "stuck on
22  the *Coral Princess* cruise ship for days … were diagnosed with A-1 flu on Saturday
23  28 March, but not tested for Coronavirus." MR. NAHM added that "the Captain said
24  there are sick people on the ship… they took our temperatures but did not tell us
25  why… everyone is quarantined in their rooms now." MR. NAHM closed the video
26  by saying that "We are worried and scared what will happen."

27  / / /

28  / / /

129.   Thereafter, on April 1, 2020, MR. NAHM'S test came back positive for COVID-19, but he and MRS. NAHM were still left in their stateroom without medical help.  Nobody on the *Coral Princess* medical staff responded to the NAHM'S pleas for help.  They reached out to their son Paul Nahm in New Jersey, who desperately sought help from DEFENDANTS via social media.  The NAHMS' son Paul was advised that MR. NAHM was seen by a nurse and provided with new medication.

130.   On April 2, 2020, the NAHMS' son was advised by DEFENDANTS that "the Senior Dr. was able to speak with them [the NAHMS] directly.  We were informed that your father is getting the care he needs at this time."  Nothing could be further from the truth.  The NAHMS were both sick and distressed with fever, cough, diarrhea and vomiting in their stateroom.

131.   On the evening of April 3, 2020, a ship's nurse came to the NAHMS' stateroom, advising them that MR. NAHM would be separated from MRS. NAHM to relocate MR. NAHM closer to the medical center.  The NAHMS were fearful of being separated and objected, especially since they were both already sick and had been quarantining together for days.  The NAHMS felt they should be moved together

closer to the medical center.   In response to the NAHMS' objections to being separated, the nurse threatened them by stating that if MR. NAHM did not separate and go to a different room, neither of them would receive any further medical treatment.   Thereafter, both NAHMS were ignored by DEFENDANTS.

132.   On April 4, 2020, after the denial of permission to land at Fort Lauderdale, the *Coral Princess* arrived in Miami. Five passengers were taken off the ship immediately. Two of the five were sent to a local hospital in Miami and the three others were airlifted to Tampa.   The NAHMS, however, continued to be ignored and kept onboard despite becoming sicker and their deteriorating conditions.



The Coral Princess docks at the Port of Miami in Miami, Florida on Saturday, April 4, 2020.(Pedro Portal/Miami Herald)

133.   On April 5, 2020, despite both being seriously ill, the NAHMS were still ignored and kept onboard the *Coral Princess*. Apparently, they were not considered serious enough.   DEFENDANTS never administered X-Rays to either MR. NAHM or MRS. NAHM. Finally, MRS. NAHM called the emergency number to report that MR. NAHM was extremely ill, and DEFENDANTS finally started attending to him. Around 9:00 pm on April 5, the NAHMS' son finally heard from DEFENDANTS

who reported, "Hi Paul, we just heard from the ship that your father is in the onboard medical center.  Unfortunately, that is all the information we have at this time."  Although MR. NAHM was finally seen by onboard medical personnel, there was no update provided for MRS. NAHM.  By late that evening, MR. NAHM'S condition had deteriorated.

134.   On April 6, 2020, MR. NAHM was fortunate that an ambulance was available to rush him from the *Coral Princess* to Baptist Main Hospital in Miami, Florida.  He remained hospitalized and treated for COVID-19 for 34 days until May 10, 2020, when he was discharged and transported to the Crowne Plaza Hotel in Miami, to quarantine alone until May 13.  He took an Amtrak train to New York.  MR. NAHM did not arrive home until May 14, 2020, seventy-two days after departing for what was supposed to be a two-week cruise with his wife and friends.  As of this date, MR. NAHM is continuing to recover and unable to return full-time to work.

135.   Meanwhile, on April 5, 2020, while MR. NAHM was in the ship's medical center and later taken to the hospital, MRS. NAHM was left alone in their stateroom and ignored by DEFENDANTS.   The NAHMS' son pleaded with DEFENDANTS to check on his mother MRS. NAHM "who is very ill… do we have to wait until it's an emergency?"  DEFENDANTS' agent reported to their son that "she is feeling fine for now … She also was visited by the medical team about an hour ago.  We are working to have someone check on her twice per day."  Nothing could be further from the truth.

136.   On April 6, 2020, just after noon, MRS. NAHM, alone in her room and ignored by *Coral Princess*  crew, could not be reached by her son, and he pleaded for help, asking "did my mother, Grace Nahm room A528, call 911 today? i cannot reach her. My mother just called me saying she is being taken. pls get back to me asap."  DEFENDANTS responded, "We'll message you back as soon as we hear from them."  The NAHMS' son continued to get nowhere and was told to call the "family assistance line."  After trying all day, he responded, "the number is a call center and they said

they have no idea what's going on the ship now." It was not until after 8 pm, that their son received a message, "Hi Paul, we just heard that your mother is being medically disembarked and is being taken to Baptist Main Hospital. That is all the information that we have at this time." He was referred back to the "family assistance line" for further information.

137.   From April 6 to 8, MRS. NAHM was hospitalized at Baptist Main Hospital the in Miami with COVID-19. She did not see MR. NAHM. When she was discharged, she was transported to the Hyatt Hotel in Miami for two nights, and was then flown by Medevac on April 10 to Long Island, New York. No representative of DEFENDANTS contacted the NAHM family to make sure that MRS. NAHM arrived home safely. MRS. NAHM was gone for thirty-six days, for what should have been a 14-day cruise. As of this date, MRS. NAHM still suffers physically and mentally, is continuing to recover, and unable to return to any semblance of her prior normal life.

138.   As of the date of this filing, both MR. NAHM and MRS. NAHM are still recovering from COVID-19 symptoms and confined to home in Syosset, New York. They have not been reimbursed for many costs associated with their illness, including medical and meals.

139.   As a direct and proximate result of DEFENDANTS' negligence and gross negligence, MR. NAHM and MRS. NAHM were infected with SARS-CoV-2, and contracted COVID-19 requiring medical treatment.

140.   As a direct and proximate result of DEFENDANTS' extreme and outrageous conduct, including threatening and abandoning the NAHMS in their stateroom for days after DEFENDANTS knew that the NAHMS had contracted COVID-19, knew that the NAHMS' conditions were deteriorating, even after making anchor in Miami, Florida, but did not provide further medical treatment.

141.   In addition to their disabling physical injuries, PLAINTIFFS were traumatized by the fear of developing COVID-19. They were confined to the *Coral*

*Princess* as the virus attacked and infected passengers on board the ship, and thereafter were confined on board at PortMiami and at other locations in Florida as they underwent treatment for COVID-19, separated from each other without knowledge about the other, and ignored in isolation in quarantine.

## G. CARNIVAL IS NOW UNDER CONGRESSIONAL INVESTIGATION FOR THEIR KNOWLEDGE OF INFECTIONS

142. The history of CARNIVALS' disregard of the health and welfare of their passengers has not gone unnoticed as Congress looks into how so many people fell ill aboard cruise ships in the present crisis and the industry's failure to contain the spread in time. On May 1, 2020, the Chair of the U.S. House of Representatives' Committee on Transportation and Infrastructure Peter DeFazio and the Chair of the House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney summarized this history in a records request letter to CARNIVAL formally opening an inquiry.[65] In the words of the DeFazio-Maloney letter:

> *Norovirus and other communicable diseases are not new public health threats to the cruise line industry. In 2010, the World Health Organization (WHO) identified norovirus and influenza outbreaks as "the major public health challenges for the cruise industry." This assessment was made an entire decade before COVID-19 emerged on the world's stage. . . .*
>
> *Cruise ships are a fertile breeding ground for infectious diseases due to their environmental conditions and physical structure. "Cruise ships passengers spend prolonged periods in close proximity to other passengers and crew, facilitating the rapid spread of highly infectious agents such as influenza," the Journal of Travel Medicine reported in 2018.Today, the CDC warns: "Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships."*

---

[65] Letter to Mr. Arnold W. Donald, President and CEO, Carnival Corporation & PLC, from the Committee on Transportation and Infrastructure, U.S. House of Representatives, Washington, D.C. (May 1, 2020). (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

143.   Nevertheless, CARNIVAL and PRINCESS disregarded this crucial information and continued their operations as though nothing had changed, and despite their vaunted commitment to help aboard their ships, continued marketing their cruises largely as before. As the DeFazio-Maloney letter noted:

> *As of April 23, 2020, none of the front facing web-pages from any of Carnival's nine affiliated cruise lines , – Carnival Cruise Line, Princess Cruises, Holland America Line, Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK), and Cunard – mentioned a single word about COVID-19, coronavirus, or the precautions these cruise lines intend to take once the CDC lifts its "No Sail Order" for cruise lines. Instead, these sites are advertising various images of couples dining and dancing, musicians entertaining, and lines of children holding hands and playing.*



66

## V.   <u>NOTICE</u>

144.   Section 15(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims within six months from the date of the underlying harm before commencing

---

66 https://www.theguardian.com/world/2020/apr/04/coral-princess-cruise-ship-docks-florida-coronavirus-pandemic. (last accessed June 5, 2020).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

litigation. PLAINTIFF is resolute that this egregiously unfair provision is unenforceable. Nevertheless, PLAINTIFFS have complied with this requirement by providing written notice to DEFENDANTS' by overnight mail on September 2, 2020.

## VI.   CLAIMS

### FIRST CLAIM

### NEGLIGENCE

### (On Behalf of Mrs. Nahm and Mr. Nahm

### Against Each Defendant)

145.   PLAINTIFFS incorporate herein by reference all of the allegations in this complaint.

146.   As owners and operations of the *Coral Princess*, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, owed PLAINTIFFS a duty to use reasonable care to prevent harm PLAINTIFFS and other invited passengers aboard the *Coral Princess*.

147.   As owners and operations of the *Coral Princess*, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, participated in the boarding process, the decision to set sail, the failure to provide personal protective equipment to PLAINTIFFS and others on board, the failure to impose distancing requirements, and the failure to sanitize the ship's surfaces.

148.   DEFENDANTS PRINCESS, in consultation with and with the full authorization of CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, carelessly, recklessly, and/or unlawfully boarded the *Coral Princess* in San Antonio, Chile on March 5, 2020, which served as the legal cause of injuries and damages herein suffered by PLAINTIFFS.

149.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to act as a reasonably careful reason would have acted in the same situation.

150.   As alleged in more detail above, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to use reasonable care to prevent harm to others, including PLAINTIFFS herein, when (among other things) they failed to warn MR. and MRS. NAHM of the deadly virus aboard the ship and allowed MR. and MRS. NAHM to board without implementing any sort of protective measures.

151.   MR. and MRS. NAHM were harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when they contracted and suffered from COVID-19. Further, MR. and MRS. NAHM  were harmed by DEFENDANTS CARNIVAL and PRINCESS' negligence when they suffered the distress of being stuck in their room at sea with no explanation, contracting a deadly virus, threatened separation, withheld necessary medical care, observing each other fall ill without explanation or medical care, feared for each other's lives and their own, and were unable to spend time  be together for an extended period of time.

152.   The failure of DEFENDANTS CARNIVAL and PRINCESS to use reasonable care to prevent harm was a substantial factor in causing PLAINTIFFS' harm.

153.   DEFENDANT PRINCESS, in consultation with and with the full authorization of CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others, negligently, wrongfully, unlawfully, and/or recklessly invited and boarded MR. and MRS. NAHM onto the deadly cruise ship armed with COVID-19, without providing any notice, warning, or precautionary medical apparatuses, such as masks, and without imposing any safety precautions, such as social distancing, and/or imposing quarantine on prior exposed passengers and/or crew.   DEFENDANTS PRINCESS, in consultation with and with the full

authorization of CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others,   negligently, wrongfully, unlawfully, and/or recklessly boarded passengers, including PLAINTIFFS MR. and MRS. NAHM, without disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship and/or administering any COVID-19 tests or screening to any prior passengers and/or crew, leaving all new passengers, including MR. and MRS. NAHM, completely, unknowingly, and inescapably exposed to the deadly virus.

154.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, ignored the "state of emergency" declarations related to COVID-19 made by the Governors of both states as of March 4, 2020, and instead made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures, despite knowledge of the catastrophic risk to human life that COVID-19 posed and despite knowledge of the specific and acute threat the cruise ship industry presented related to COVID-19.  The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, knew of the specific and acute threat the cruise ship industry presented related to COVID-19 as of March 4, 2020. The officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, also knew of the catastrophic risk COVID-19 posed to human life as of March 4, 2020.  Despite the aforementioned knowledge, the officers, directors, and/or managing agents of DEFENDANTS, and/or each of them, made the negligent, wrongful, unlawful, and/or reckless decision to continue cruise ship operations without implementing any safety protocols and/or preventative measures to combat the foreseeable, specific, and/or acute and catastrophic threat posed to their passengers, including but not limited to, (a) screening and refusing to board passengers and crewmembers with recent contact with countries experiencing outbreak of COVID-19; (b) providing precautionary medical apparatuses, such as masks, gloves and/or hand sanitizer; (c) imposing safety precautions on-board, such

as social distancing; (d) disinfecting, decontaminating, and/or sanitizing the exposed surfaces of the cruise ship prior to boarding passengers; and/or (e)  changing how they off-board and on-board passengers to the ship, instead of using practices where passengers off-boarding the ship come in close contact with passengers on-boarding the ship.

155.   As a direct and legal result of the aforementioned wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, PLAINTIFFS both got COVID-19 on the *Coral Princess*.

156.   DEFENDANT PRINCESS, as authorized by CARNIVAL, and/or each of them, and their agents, representatives, employees, officers, and others, also sold PLAINTIFFS the air travel that conveyed them to the cruise departure point from New York.

157.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, participate in the marketplace as common carriers. Tickets for its cruises are marketed to the general public. In addition to a vacation, as part of the contractual relationship reached between DEFENDANTS and their customers, passengers aboard DEFENDANTS' cruise ships may reasonably expect and do expect safe passage on ocean-worthy vessels free from any known or knowable dangers or perils.

158.   Common carriers must carry passengers safely. Common carriers must use the highest care and the vigilance of a very cautious person. They must do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers. While a common carrier does not guarantee the safety of its passengers, it must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, failed to do so here.

159.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFFS were injured in their health, strength, and activity, sustained injuries to body and mind, all of which have caused PLAINTIFFS great physical, mental, emotional, and nervous pain and suffering.   PLAINTIFFS are informed and believe, and upon such information and belief allege, that such injuries have resulted in debilitating injuries, all to their general damage in a sum according to proof.

160.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFFS are required to, and continues to, employ physicians and other health care providers to examine, treat and care for her injuries, and have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment rehabilitation and care in an amount according to proof.

161.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFF MR. NAHM was gainfully employed, and/or capable of gainful employment through his education, training, and/or experience. By further reason of DEFENDANTS' wrongful conduct hereinabove alleged, PLAINTIFF MR. NAHM suffered a loss of income and/or a loss of earning capacity in an amount according to proof.

162.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFFS contemporaneously perceived they would die from COVID-19, and thereby suffered extreme emotional distress, including nervousness, grief, anxiety, worry,

mortification, shock, indignity, apprehension, terror or ordeal, all in an amount according to proof.

163.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFFS suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, society, and moral support, all in an amount to be determined.

164.   As a further direct and legal result of the wrongful conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, hereinabove alleged, PLAINTIFFS incurred expenses, all in an amount to be determined.

165.   In doing the wrongful acts as hereinabove alleged, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, acted with oppression, fraud, and malice and/or with conscious and/or willful disregard for the health, safety and general welfare and rights of PLAINTIFFS. Such actions were done with malice, oppression, fraud, and/or conscious disregard for human life and were and are despicable, shocking and offensive and entitle PLAINTIFFS to an award of punitive damages against DEFENDANTS in an amount to be determined at trial. DEFENDANTS' failure to heed the warnings of the California and Florida Governors and the CDC and to apply the knowledge gained from the outbreaks aboard the *Diamond Princess* and *Grand Princess,* decision to proceed with cruise ship operations, including the *Coral Princess* cruise, without changing any operations to better safeguard passengers' health and/or safety, including but not limited to,  pre-screening passengers, disinfecting or decontaminating the ship, providing masks and/or gloves, was an extreme departure from what a reasonable cruise ship owner and operator would do and reflects callousness and an extreme, willful, and outrageous disregard for the health and safety

of its passengers. Especially considering the DEFENDANTS' knowledge of the specific, acute, and/or foreseeable threat that cruise ships, and their ships in particular, posed related to COVID-19 and catastrophic risk to human life that COVID-19 posed. In all of these decisions, DEFENDANTS were driven by profit, and chose not to expend resources for the safety and health of passengers, but rather keep them ignorant and in the dark so they would proceed to enjoy their vacation as planned and spend money on onboard purchases, where DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, make their largest profits.

## SECOND CLAIM

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (On Behalf of Mrs. Nahm and Mr. Nahm

### Against Each Defendant)

166. PLAINTIFFS incorporate herein by reference all of the allegations in this complaint.

167. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, knew or should have known of the actual risk of the viral contagion or novel coronavirus now known as SARS-CoV-2, and the resulting disease COVID-19, aboard their cruise ships, particularly based on their experience with COVID-19 outbreak aboard the *Diamond Princess* four weeks prior to the instant voyage aboard the *Coral Princess*. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, knew or should have known that it was especially dangerous, and extreme and outrageous, to expose PLAINTIFFS and other passengers to COVID-19.

168. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, knew or should have known of the extreme risks to the health and safety, including the possibility of serious

illness and death, presented by COVID-19, by or before the time of boarding PLAINTIFFS and other passengers onto the *Coral Princess* on March 5, 2020.

169.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, exhibited and/or engaged in extreme and outrageous conduct when, for example, DEFENDANTS boarded PLAINTIFFS onto the *Coral Princess* on March 5, 2020, without warning and/or taking any effective measures to screen or examine passengers, given their prior knowledge and experience with the coronavirus and COVID-19 illnesses and deaths, and particularly given that cruise ships present an especially heightened risk of contagion.

170.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, knew or should have known during the instant voyage aboard the *Coral Princess* that one or more passengers were experiencing symptoms of COVID-19, but passengers were told that their illness was the A-1 flu.

171.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, exhibited and/or engaged in extreme and outrageous conduct when they chose not to effectively clean, sanitize, sterilize, or disinfect the *Coral Princess* during the instant voyage.

172.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, exhibited and/or engaged in repeated and continued extreme and outrageous conduct when they failed to do a number of things including, without limitation, alert PLAINTIFFS and other passengers to the fact that at least one passenger on the trip was experiencing COVID-19 symptoms and had come into contact with other passengers and crew members; failed to notify PLAINTIFFS and other passengers about the potential and actual threat of exposure to, infection with, and the possibility of spreading the coronavirus and COVID-19 aboard the ship; failed to advise PLAINTIFFS and other passengers

about the possibility and health benefits of disembarking during the voyage, at one of the ship's ports of call; and failed to notify PLAINTIFFS and other passengers of the risks of remaining onboard the ship for the March 5, 2020 embarkation through South America.

173. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, continued to exhibit and/or engage in extreme and outrageous conduct when the voyage was supposed to end on March 19, 2020, but passengers were not allowed to disembark, and port after port refused to allow the *Coral Princess* to anchor, but onboard the *Coral Princess* restaurants remained open, activities continued as usual, and passengers were allowed to congregate and socialize in crowds without any restrictions or safeguards, and without implementing any policies for quarantine, isolation, or social distancing. There was no mention of the coronavirus.

174. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, continued to exhibit and/or engage in extreme and outrageous conduct when PLAINTIFFS were forced to suffer as they both became ill with COVID-19 and their conditions continued to deteriorate, made worse when DEFENDANTS' nurse from the *Coral Princess* medical center threatened to withhold any further medical treatment for MR. NAHM and MRS. NAHM when the NAHMS objected to being separated after being ill and quarantining together for days. Thereafter, the NAHMS were never visited again or treated by the *Coral Princess* medical staff or crew and were left abandoned as their conditions deteriorated. Even after the *Coral Princess* docked in Miami and passengers were evacuated to hospitals, the NAHMS were ignored until they pleaded for help, and their son pleaded for help via social media. As alleged herein, the extreme and outrageous conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, was simply despicable and inhumane.

175.   DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, intended to cause PLAINTIFFS emotional distress.  Alternatively, DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, acted with reckless disregard of the probability that PLAINTIFFS would suffer emotional distress.

176.   As a direct and proximate result of the extreme and outrageous conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, as to their extreme departure from the ordinary standard of care and their failure to meet their duties of care to PLAINTIFFS, which exposed PLAINTIFFS to COVID-19, PLAINTIFFS suffered illness and injury as described herein.

177.   As a further direct and proximate result of the extreme and outrageous conduct of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, in which  PLAINTIFFS were exposed to an actual risk of immediate physical illness and injury, and did contract COVID-19, PLAINTIFFS suffered severe emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged herein including, but not limited to, fear, despair, anguish, horror, terror, nervousness, grief, trauma, anxiety, worry, shock, humiliation, and shame related to their own risk of contracting COVID-19, and by the past and ongoing threat to their own health in the present and future given the unknown negative health outcomes and complications associated with COVID-19.

178.   PLAINTIFFS were endangered and harmed by the acts and omissions of DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, when PLAINTIFFS traveled on an infected vessel without appropriate information about the risks facing them.  It is reasonable to expect that PLAINTIFFS will continue to suffer and will, now and

continuing into the future, require medical care or services not of a kind generally associated with the normal conditions, or wear and tear, of daily life.

179. DEFENDANTS CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, throughout the events herein described, repeatedly acted with conscious, callous, and/or reckless disregard for the rights, interests, health and safety of their passengers, such that the imposition of punitive damages, under California Civil Code Section 3294 and/or all other applicable laws, is necessary and appropriate to punish them for their extreme and outrageous conduct, and to deter them and others, and to protect the public, from the consequences of similar acts or omissions.

180. DEFENDANTS' CARNIVAL and PRINCESS, and/or each of them, and their agents, representatives, employees, officers, and others, conduct as described herein was a substantial factor in causing PLAINTIFFS' severe and ongoing emotional distress.

## VII.    PRAYER FOR RELIEF AND DEMAND FOR JURY

WHEREFORE, PLAINTIFFS, on behalf of themselves and all persons similarly situated, respectfully prays that this Court grant the following relief:

1. For compensatory and general damages in an amount according to proof;

2. For past and future medical, incidental, and service expenses according to proof;

3. For pre- and post-judgment interest on all damages as allowed by the law;

4. For costs of suit incurred herein;

5. For attorney fees under existing law;

6. For an award of punitive damages;

7. For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

1

## JURY DEMAND

2   PLAINTIFF further demands trial by jury on all issues.

3

4   Dated: October 23, 2020          **COTCHETT, PITRE & McCARTHY, LLP**

5                                    By: */s/ Nanci E. Nishimura*

6                                        NANCI E. NISHIMURA
                                         KELLY W. WEIL
7                                        JAMES G. DALLAL
                                         *Attorneys for Plaintiffs*
8

9   Dated: October 23, 2020          **ANDERLINI & McSWEENEY LLP**

10

11                                   By: */s/ P. Terry Anderlini*
                                         P. TERRY ANDERLINI
12                                       *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**                                                          60